I call the first case for oral argument for this morning, Delaware Riverkeeper Network v. United States Army Corps of Engineers, Mr. Sepewicz. Am I pronouncing that correctly? Absolutely, Your Honor. You may proceed. Thank you, Your Honor. You've reserved three minutes for rebuttal. Yes, please, Your Honor. May it please the Court, my name is Aaron Sepewicz, Senior Attorney at the Delaware Riverkeeper Network, representing the Delaware Riverkeeper Network and Maya Van Rossum, the Delaware Riverkeeper Network. I think before we get started and get into the legal arguments today, I think it's important to make, to get the facts, an important fact of this case straight first. Well, let's deal with that very briefly because I'm eager to begin instead with the waiver issues that have been raised so we can then go beyond that. Sure. Be assured we've read the briefs and know the record. I'd be happy to address waiver first, Your Honor. Yeah, I think that is important. It has been raised vigorously, and I would like to hear from you as to why, when the matter was before FERC, you did not raise the compression issue or how, if it's your contention, you didn't have an opportunity to do so. Yeah, sure. I'd be happy to make this abundantly clear. The first thing I'd like to say is the process before FERC is a completely separate process from the process before the United States Army Corps of Engineers. I understand they're separate, but there's an interagency agreement between the two, is there not? Yes, correct, Your Honor. I think it's also important to understand the timeline of events. With regard to the Army Corps and the 404 permit that was issued by the Army Corps, the Army Corps issued their public notice on June 10th for the 404 permit. They gave 30 days for public comment. Nowhere in that public notice was any information regarding the compression alternative or any alternatives analysis whatsoever. The environmental assessment that was issued by the Federal Energy Regulatory Commission was not issued until late August. Did you have access at all to TGP's submission, which in fact did on its own raise the compression issue or set it up at least? With regard to the Army Corps' record and what the Army Corps was reviewing, no. All we had before us was the public notice itself. I meant FERC. I meant as before FERC. Before FERC, there was, yes, they had prefiling submissions, which would include Resource Report 10. Yes, they did. Did you have access to that? Compression, yes. Yes, we did have access to it, correct. Yes, Your Honor. What was the notice of? Did the notice alert you to the outlines of the project itself? Yes, the general scope of what the project is. Does the notice have to tell you all the various alternatives that the Army Corps is considering? For us to have a fair opportunity to comment on what they were or were not doing or were not reviewing, yes. And let's be clear, if you look at 40 CFR 230A-4, it clearly states that where NEPA documents, such as the environmental assessment issued by FERC, fail to consider the alternatives in sufficient detail to respond to the requirements of these guidelines, the Corps must, quote, supplement these NEPA documents with additional information. And so we had no reason to believe at the time that we had an opportunity to comment, which is only 30 days between June 10th and July 10th, that they weren't considering the alternatives. But your action here is against the Corps. Yes. And aren't you, and then FERC's responsibilities arise under NEPA, right? Correct. So aren't you really engaging in a collateral attack on FERC here? No, again, it's a completely separate process. And if the Army Corps decides that the project that is proposed doesn't meet the 404 guidelines, they don't issue a 404 permit. The project is dead. It's irrelevant what FERC does. If FERC issues a certificate, it's irrelevant, because you can't do whatever construction activity falls under Section 404 absent the 404 permit. Judge Schneider, do you have any questions on waiver before we move on? I do not. Thank you. Let's move forward, then, to the issues that you've raised. And I'd like you to help me with just what Riverkeepers maintain to be the import of the definition of the project for purposes of basic purpose. Yes. I had some trouble really understanding, well, one, basic purpose versus overall purpose, and in the end just what difference that made for purposes of the bottom line determination here. Yes, Ron, I'd be happy to clarify. So the basic project purpose is the sort of large umbrella, helps define the large umbrella, the full universe of potential alternatives to be considered by the Corps. The overall project purpose is used to whittle down which of the alternatives in that large universe is appropriate for this particular review of the 404 permit. And why that's really important here is because, as we have seen and as has been argued in the briefs, the basic project purpose was defined to build pipeline loops, which necessarily excludes consideration of such things as a compression alternative. I understand that, but help me with how or why. If basic purpose was defined too narrowly, in your view, that would constrain the agency in the universe of alternatives that it considered. Not necessarily, Your Honor, because also there was no consideration of an alternative such as using trains to transport the natural gas or using trucks through, you know, liquefying the natural gas and transporting it. But that's not what we're talking about here. So I'm sorry. Let me assume, let me jump forward. Let me assume that you're right, the basic purpose was defined too narrowly. Don't we essentially apply a harmless error analysis anyway? I mean, what difference does it make to the ultimate outcome? Right. So, I mean, my argument would be that because, so the court essentially argues that, well, we consider the compression alternative anyway, so no harm, no foul. Like, it's irrelevant that we did it the way that we did it. You've asked us to remand, right? I mean, why would we want to do that if we have determined that basic purpose was defined too narrowly? Because there's a whole spectrum of potential alternatives that exist that were not considered. And like I said, it could have been trains. It could have been some combination of looping and compression. There are a lot of different considerations. And we just don't know because they didn't follow the correct process. And if the Army Corps is allowed to do, you know, not make a water dependency determination, not define the project purpose correctly, they can't apply the overall project purpose definition either. They're not following the guidelines. But if they're allowed to proceed in this manner, it makes a mockery of the 404 guidelines and what they're intended to do. In the process, they don't have to consider every conceivable alternative, do they? I mean, do they consider those that are practical? Right. Practical or, you know, reasonable. Yes. And in that process, don't they narrow it down to those that really are doable in the circumstances presented? Yes. I mean, that's the whole purpose. Yes, that's the purpose of the overall project purpose. The Corps did that by narrowing it down to the pipeline loop and the compression alternative. As again, like I said, but we don't know if they considered other – we don't know if trucking or by train was practical or if there was another pipeline that was not fully subscribed that could have been utilized. We don't know these things because – and we don't know if they're reasonable. We don't know if they're practical because they were never reviewed. And that's why process is important. But I think in addition to process, we have to laser focus in on what the Corps' responsibilities are under 40 CFR 23010A and whether or not the compression alternative specifically was practicable and met that standard. I understand, but isn't it a fact that the Corps indicated that it did review compression here based on TGP's submission? It did review it. Yes, no doubt that they did review the compression alternative. But 230A specifically states and prohibits the Corps from issuing a permit if there's a practicable alternative that would have less adverse impact and didn't involve significant adverse environmental consequences. And the compression alternative meets all three of these elements of 40 CFR 23010A. There's no question that the compression alternative would have less adverse impact on aquatic ecosystems. In fact, for the compression alternative, you don't even need a 404 permit. There are no water resources impacted. I'm not following you. So that was a good decision on the part of the Corps? No. The compression alternative would not even require a 404 permit. Had Tennessee chosen to just do the compression alternative and not even propose pipeline looping, they wouldn't even need to get this permit. Yes, but didn't the Corps ultimately decide that it would have other significant adverse environmental consequences? Yes, and that's the argument that they make. I understand that's the argument they make. That's pretty clear. But didn't they do that? Didn't they, in fact, in terms of process, make that determination? No, there's not a single piece of evidence that the Corps can point to where the specific conclusion is drawn that the compression alternative involved significant adverse impacts. In fact, in the briefing itself, the Corps doesn't even define what significant adverse environmental consequences are. I understand that. Assuming that that's the case, assuming the Corps did not perform detailed analytical review, was it required to do so under the principle of commensurate review? Yes, Your Honor, I think so. What does commensurate review mean to you? I think it means that the review that the Corps performs is proportional to the size and impact and scope of the project. And to the extent that is true, all you have to do is look at the environmental assessment that FERC issued. It was over 100 pages. There were four appendices. It was pretty detailed. And here all we have is unquantified, unqualified air noise and light impacts that FERC routinely finds are not significant. And I would submit to you to look at the Minnesotan compressor station case, where we had a compressor station that was on a larger tract of land that had more horsepower and involved impacts to several streams and waterways. And the Federal Energy Regulatory Commission and the Corps decided that was not a significant impact under NEPA. So if you're looking at what is significant, like I said, the Corps didn't define what that is. But if you're going to compare it to NEPA, this is clearly not a significant environmental consequence. Even if the Corps did not do that with respect to the significant factor explicitly, by rejecting those permanent impacts, which had been suggested here, in favor of other impact that the Corps deemed to be temporary in nature, didn't the Corps implicitly find those impacts too significant to entertain? Implicitly? I mean, I don't know. I can't speak for what was in the mind of the Corps' decision makers. But do it from our perspective, because we are reviewing this with a very deferential standard of review. And we're required to look at the entire record, in addition, that was before the agency. Isn't that reasonable for us to draw from this record and from what they have determined and the obvious weighing process they would have had to have gone through? I don't think it's a reasonable position for the Corps to have taken that that is sufficient to show significant impacts. I think you need at least a conclusion somewhere in the record that says this is significant. I mean, it would take one sentence. And they never went through that process and did that. Judge Nygaard, do you have anything at this point before we have Mr. Stemperwitz back on rebuttal? I have no questions. She does not. Thank you very much. Thank you. Mr. Stemperwitz, we'll have you back on rebuttal. Rather than make the attempt and embarrass myself, will you help me with the pronunciation? Of course. May it please the Court, my name is Varu Chilakamari with the United States. Chilakamari. Yes. Ms. Chilakamari, thank you. Thank you. And I have with me at counsel's table Amanda Philly, who is counsel for Army Corps of Engineers. And we've agreed that I will take ten minutes and counsel for interveners, Mr. Stowiak, will take five minutes. Very well. Your Honor, you are well familiar with the facts. I will just say that this case, the permit that the Corps issued in this case, does not result in any loss of wetlands. This case is not about a significant impact on wetlands. Rather, it's about process. And the Corps, in this case, followed the appropriate process under the Clean Water Act 404 guidelines and, importantly, under the interagency agreement and the interagency framework in this particular type of case that is mandated by the Natural Gas Act. Instead, it is the petitioners who have not appropriately utilized the process. And if it pleases the Court, I'd like to start first with the forfeiture arguments and then answer any questions on the merits. Yes. On the forfeiture issue, I think there's two points here that are important to note. First of all, the petitioners were actively involved and engaged in the hearing before the commission, and they were sophisticated in their engagement. And I'll take you through the timeline because I think that's important. The gas company submitted its application to FERC in October 2015, and its application included an extensive alternative analysis. Rather than have you waste valuable time on that timeline, and we are familiar with it, let's get to the heart of this. Waiver is a prudential rule. Forfeiture is a prudential rule. Here we have some discretion. But beyond that, isn't there an exception that applies for waiver when an issue has indeed been brought somehow, someway, by someone to the agency's attention? Yes. And that being the case, didn't that happen? The AGP brought it to the agency's attention. They're not surprised, right? That is correct, Your Honor. There is an exception for waiver for issues that are obvious. The public citizen case set forth that exception. We don't think that exception applies here because it's not simply the question that I think the Court asks, it's not simply whether an issue is obvious. And the Sierra Club v. Bostick case in the Tenth Circuit that we cite in our brief sort of spells this out. The issue on forfeiture is whether or not the agency's failure was obvious. Now here we admit that the compression alternative, the existence of a compression alternative, surely was obvious. It was presented by the applicant themselves. But the question is did the core error, and was that error so obvious when it looked at the information, decided that the information that the applicant submitted to it was sufficient, and moved on and did not further evaluate that alternative? Was the applicant aware of the compression alternative during the public hearing process? Was the applicant aware? Yeah. How would it have been made aware of that? The petitioners? Yes. The petitioners were aware of the compression alternative because the compression alternative was attached to the gas company's application before the FERC. And the petitioners intervened in the commission's process a few days after that, and they were active in that intervention. And now I understand that petitioners argue that these are two separate processes. Well, they are. And wouldn't you concede that it is a bit unusual to have what we have here, that your argument is in essence that Riverkeeper waived an argument before the core by failing to raise it before a different agency? I think that if this were a case where the only issue was a core permit and the core was acting in isolation, then we probably wouldn't be making that argument. But this is not that case. And the reason why is because the Natural Gas Act mandates that the two agencies work together. And this is clearly known to the public, and it's known in this particular case. And I want to point to specifically two places in the record that show you that these two processes were interrelated and that the petitioners were aware of that. First of all, the core, when the process began, consistent with the Natural Gas Act, consistent with the interagency agreement, the core sent a letter to FERC. That letter is at JA87. That letter was part of the FERC docket, so petitioners had it. And it stated that we will be a cooperating agency with FERC when they're doing their environmental assessment and that we will rely on the alternatives analysis and the information that you provide in that assessment. Then when the core issued its own public notice, even if nobody was following the FERC docket and you were just looking at the core's public notice, that public notice refers the public to the FERC docket, and it says we will be a cooperating agency in FERC's environmental assessment. That public notice is at JA95, and the letter before that that the core sent to the FERC is at JA87. And both of those documents are from the core, and they link their process to FERC's process. Because you've taken your allotted ten minutes, and we don't watch the clock overly carefully here, but we've spent time so far on the waiver issue, and I think the panel has a pretty good handle on that. I think it would probably be worth your time to move on. And I'm not sure, and I don't want to ask questions that overlap between the areas that you want to cover and the areas that Mr. Stobiak will cover. Sure. I'd like to, if it pleases the court, I want to talk about the decision in terms of the environmental consequences. Could you also include the process by which you took into account the compression alternative? It seemed like the core gave that alternative a very short shrift. Sure, Your Honor. So the corresponding decision, and let me start with the guidelines. If the guidelines say that the core should not provide a permit, if there is, and there's a three-step process, if there's a practical alternative that has less adverse impact, and then finally, even if there is one of those, if it has significant adverse environmental consequences. And that's where the compression alternative was considered. Yes, it's that third criteria that was the primary decision for the core. Now the core, and I want to point the court to a couple of places in the record that support the core's decision. But the petitioners have claimed that the core's decision doesn't say anything about the environmental impacts, and I don't think that's quite accurate. If you look at JA-438 and 446, the core makes two findings. And it's in a paragraph at JA-438, but the core essentially says, we are going to prefer the project over several alternatives, including the compression alternative, because the project is a pipeline that is being buried underground next to an existing pipeline, and it's in the existing right-of-way. And doing that kind of project where you're restoring the work has less environmental impact. And what they actually say is... But of course it's going through the wetlands. It is. It's going through... Which is a significant point for the objective. It is, and that's why they need a permit. It is crossing through less than 10,000 feet of wetlands. The compressors would not disturb the wetlands, I assume. No, it does not appear that the compressors would. I think they have to be connected to the pipeline, but no, it would not. But the core made the finding that the project, because there's already an existing right-of-way, there's already been a pipeline that has cleared land, the project would have less impact than clearing of a greenway. Let me return to a question of process here and the nature of the relationship or the agreement between the two agencies. One unusual factor, maybe that's not the best adjective I could use, but is the fact that we have here a draft EA and a final EA, and the latter has an omission, a significant omission, if I may, of something that appeared in the earlier draft. Process-wise, what weight, if any, should we give to the draft EA, especially given the fact that it was not publicly circulated? I think the draft EA is an internal draft. It's not a formal draft that's up for public comment. It is part of the core's record because it contains factual information that was before the core when it made its decision. Are you able to explain why the compressor issue was addressed in the draft but not ultimately in the final report or final EA? I think that the draft EA and the final EA answer that question themselves. The final EA explains that alternatives were considered up until the point that they were no longer reasonable, they wouldn't satisfy the project's overall purpose, or they would have more significant environmental... But what should we make of this language in the final EA? Quote, did not evaluate any above-ground facility site alternative. I think the petitioners have argued that, but I actually think that that statement is not a confession at all about the compression alternative. If you look at JA-335, and I think you have to step back and look at the project, the project is mainly a pipeline looping project, but it also had some modifications to an existing above-ground station. And what that statement in the EA is talking about is that they were not looking at any alternatives to that modification of the above-ground station because that part of the project was not a significant project. So saying that we did not consider any above-ground facilities does not mean that they didn't consider alternatives to the pipeline. And I want to be clear here, the agency did consider alternatives that were not water-dependent and not relating to the pipeline. For example, not only did they consider the compression alternative... You're going very fast. I apologize, Your Honor. Fortunately, we don't have a court reporter. I apologize. I wanted to ask you that you had mentioned some... You gave some statements why the compressor was rejected, but why was it? Why was it not more viable or practicable than the pipeline loops that were eventually approved? So what the draft EA says is that the compression station would require the construction of an above-ground facility with a large plumbing footprint. And if you look at JA210 and 212, that contains a discussion of the pros and the cons of the compression station. And they say that even if you take a one compressor station 40 acres, that would require the clearing of 28 to 38 acres of forested land, along with other environmental impacts including light, air, and a lot of noise. Now, the final decision document echoes that reasoning and says that co-locating a pipeline along an existing right-of-way wouldn't require the clearing of a greenway. What is the basis of even an implicit determination of impracticability here? So I think that that's a separate ground on which you could affirm the permit decision. And I think that there is some support for a finding of impracticability, and that would be the basis of cost. Well, that's what TGP's report said. It talked about efficiency, didn't it? Yes. The TGP report says that the compression alternative would result in higher fuel and operating costs. And if you look at JA210. If we were to suggest that, haven't we really engaged in something that is not properly done in our review, which is supplying a reasoned basis that the agency did not express? I don't think so, Your Honor. I think the final core decision does make a finding. In addition to there being an environmental impact, they also make the finding that the compression alternative was not practicable. And they make that finding in the conclusion of the statement of findings document. And then that finding has support in the record. Not only is it supported by the intervener's expert report, but it's also supported at JA211. There's a chart that says that there's lower fuel economic efficiency with the compression alternative. So there are parts in the record that support that conclusion. Yeah, I was looking at that chart as you speak. But there are some very positive aspects of the compression. Yes. Yes, and so I think there are pros and cons. And the question is, was there support for the decision here? And there is. That chart and the rest of that section talk about there being a permanent above-ground clearing of 28 to 32 acres. It certainly does meet the purpose and the need for which it would be constructed. Yes. The answer is yes. Yes, but that's not the only criteria. And that's not the criteria that the Corps rejected the permit. It was based on the fact that this would result in a permanent above-ground footprint. And there's one other place in the record, if I could point you to, Your Honor. If I could get an idea. I don't know what one looks like. But you mentioned 40 acres. That's a large track of land. And would it be one compressor or would it be two compressors? So the applicants, I think, would have a better handle on this. But their application says it would be. I think the pipeline company would probably have a better handle on that. Yes, that's right. But I just want to get a vision. I mean, it sounds like a monstrous thing. If the design is to move the gas through the pipelines at a faster rate, it just visually sounds like not a very pleasant thing to look at. I don't think it might be. I don't know. So I'm trying to get a picture of what we're talking about. I don't think there's a literal photograph. Efficiency is high. It will do the job, apparently. I don't know about the cost. I imagine you took into account cost as well. Yes, I mean, cost was considered. It was in that chart. No big difference in the cost, I guess. I'm sorry? No big difference in the cost. I don't think that there's a finding about that. They say that it would result in higher fuel efficiency, fuel economy costs, and operating costs. And the gas company's permit application shows that it would require not just the construction of a station but the clearing of roads. You need parking lots, pertinent equipment, and so forth. And so there are reasons why it takes 40 acres. And their argument is that they actually need two compressor stations, which I think a fair reading of their application is that it would require actually two 40-acre sites. But regardless of whether it's two 40-acre sites or one, it's the construction of a large facility when the option is to co-locate a pipeline where you have already fragmented the land. And the environmental assessment makes it clear. It says at JA-327 that in general, when you're talking about not brand-new pipelines but co-locating a pipeline, burying it underground next to an existing pipeline, that's generally preferable and reduces fragmentation because you've already bisected that area of land. Judge Nygaard, do you have questions? So Judge Smith, they've all been asked and answered. Thank you. Thank you very much. Thank you very much. We'll hear now from Mr. Stowiak. May it please the Court, my name is John Stowiak. I'm here on behalf of the Intervenor Tennessee Gas Pipeline, which is the holder of a FERC Certificate of Public Convenience and Necessity. As the District of Columbia Circuit declared in a decision issued just a few weeks ago on June 23, 2017, in the Millennium Pipeline versus Segos New York State DEC case at 2017 Westlaw 2697987, for any company, I'm quoting, for any company desiring to construct a natural gas pipeline, all roads lead to FERC. It goes on in an opinion there that you can look at and assess that. That's consistent with the fact that the Natural Gas Act vests FERC with exclusive jurisdiction over interstate transportation of natural gas, as confirmed by the Supreme Court in the Schneiderwind case. That is the backdrop for the waiver question because on the waiver question that's been asked, there was full disclosure of an analysis of alternatives in Resource Report 10, which was part of the FERC record, and in the joint application that went to the Army Corps and to the Pennsylvania Department of Environmental Protection. That analysis of alternatives went on for 32 pages, considered all sorts of alternatives, including the compression alternative. Delaware Riverkeeper Network submitted 81 pages of comments over 11 months before the FERC. Never once did it raise a challenge to the compression alternative, based on the arguments they're making here today. They filed a rehearing request with FERC that's pending before FERC now. They did not raise the compression alternative. They had full notice and full opportunity. I think we can all agree on that, and I'm sure you heard my questions to Ms. Chalakamary. Why, however, with a prudential rule such as this, should we not look to the fact that the issue was brought to the agency's attention? They haven't been blindsided here, notwithstanding the fact that it was not expressly or explicitly brought to them by Riverkeepers. Because all roads lead to FERC, and FERC is the agency that has the technical expertise to determine whether or not this alternative of two compressor stations, two 40-acre greenfield sites is feasible or not feasible, and make all those determinations, which in fact it did if you look at the certificate order, paragraph 66 of the certificate order issued by FERC, which says while Delaware Riverkeeper presents general alternatives that would potentially result in less impact, Tennessee's application and its response to Delaware Riverkeeper's comments provide further evidence that the Orion project could not be satisfied by relying on other transportation systems or looping, compression, and alternatives along Tennessee's own system. So they've already made that determination in that regard. They're the experts in terms of natural gas pipelines. They have exclusive jurisdiction. That doesn't explain why. It just says it is. I know. It also doesn't explain why in the draft EA they would at least discuss the issue, raise the compressor alternative, but omit it from the final. Well, the record is absent of an explanation on that, but the record, I can speculate, Your Honors, but I think the point is they made a determination that that wasn't an alternative that was viable here. What do you mean by viable? Well, it wasn't an alternative. That's what they said in the certificate order. It sounds like it just says we don't want that one. We want this one. Well, they compared the two. I think the obvious thing we can infer is that they It would be helpful if there was some analysis why this is better for the project that we have the power of approving. I agree with that, and I'll address that in a second, but on the process point, the place this should have been heard is in the re-hearing before FERC, and then if there's a subsequent appeal from that re-hearing decision by the Riverkeeper Network. They, however, have intentionally waived that by not raising it in the re-hearing request. They cannot raise that again in that regard. They made an intentional, and I submit, strategic judgment to raise it here but not raise it there. You do agree that it is the responsibility of FERC to consider all viable alternatives? Yes. To make comparisons and to, in its ultimate decision, determine which is the best and then reason why. Right, and I think we have the conclusion of FERC, and we can infer from the record that's before FERC why they made that decision. You have on one hand Well, not only why, but that we can infer from that entire record that they engaged in a consideration of alternatives and a weighing process. Well, I don't think you can presume that they didn't engage in that. That process went on for 15 months. And that's the opposite of what I asked. We can assume that they did engage in some kind of weighing process. Correct. So to go back to your earlier question, Judge Fuentes, you have on one hand the proposed project, which by the way is under construction with the hope and expectation that the construction will be completed by later this year and in service in time for next winter's heating season. There were three emergency motions to stay this. Judge Greenaway and Judge Roth, and Judge Greenaway wrote opinions, actually wrote orders that had three or four paragraphs explaining that he was denying or he and Judge Roth were denying those motions on the basis that there wasn't a likelihood of success in the merits and there wasn't irreparable harm. I'm sure you're familiar with that. But the point about the comparison, you have on one hand a looping project 99.5% co-located with an existing right-of-way that's already crossed streams and wetlands there. That's the Line 300 that's been there for multiple years, at least 50, 60 years and probably longer. You have a determination by the environmental assessment, which is by the FERC staff, and the certificate order by the FERC commission, by the Army Corps of Engineers, and by PADEP, that these impacts from the project will be minor and temporary, as you pointed out. By contrast, if you look at the compressor station alternative, and it's two, if you look at the drawing of JA405, you'll see there clearly on that that there are two compressor stations, two yellow blocks. It's in the record. There's two yellow blocks in the record there that show compressor stations. So there are two there. So you have minor and temporary impacts, a determination by FERC. There's no significant impact to the human health and the environment. On the other hand, you're going to do it Greenway, Greenfield. You're going to create two compressor stations, 40 acres. You're going to build roads, which will have impervious cover. You will build buildings, which will house the turbines. You'll have parking lots. So you'll have lots of impervious cover, as the lawyer for the Army Corps pointed out. According to the draft EA, you'll knock down trees, 28 to 38 acres of trees. And it is permanent. Let me ask at this junction, Mr. Stowiak, our colleague, Judge Nygaard, if he has questions to ask you. I do not. Thank you, Judge. All right. With that, we are over time. If you want to just wrap up quickly. I think the key thing is to keep your eye on the impacts here, which are minor and temporary versus the compressor station alternative, which is permanent. And you can make a judgment of how significant that is. But there is no dispute that those are permanent impacts versus temporary impacts. And you've got agencies looking at that, FERC, DEP, and the Army Corps, all determining that there's minor and temporary impacts here. Thank you. Thank you very much. Mr. Stavowitz, you have rebuttal. Thank you, Your Honor. I would like to first address the issue of why we didn't raise this issue before FERC in our rehearing request that's still pending before that commission. And I think it's important to understand that we didn't raise it before FERC in our rehearing request because it's not on our understanding right now that FERC's analysis under NEPA, pursuant to the alternatives analysis, that there was a violation of NEPA. FERC doesn't do analysis of the Clean Water Act and whether or not the project complies with the Clean Water Act. So it's completely irrelevant, completely irrelevant. The next thing I'd like to talk about real quickly is the draft environmental assessment. And it makes it abundantly clear that it's not two sites. It's a single site. There were two potential locations for the compressor station, right? And that's what those two boxes that Mr. Stowiak was referencing. Mr. Stowiak was just referring to two sites. Yes, exactly. That's completely untrue. It's not two sites. It is two structures. No, it would be one construction site on 40 acres of land for one compressor station. That's it. And that's clear, very clear in the draft environmental assessment. And if you read Resource Report 10, every single reference to the alternative is in the singular because it only requires two compressor stations for moving 130,000 decatherms of gas of 20,000 horsepower. It's a massive overbuild. And you can just look at the facts of, again, the Minisink compressor station, how much gas that was moving. And you'll also see with Minisink that only in that case involved a site of 70 acres. The amount of acreage that was actually impacted by the site, by the compressor station, was 10. And furthermore, if you want to talk about impacts and whether or not they're significant, Mr. Stodek was saying, well, there's 28 acres of impacts for the compression alternative. You've got to clear 28 acres of land, 28 to 38 acres depending on which of the two sites was chosen. If you're comparing that to the looping alternative, the looping alternative will necessarily result in 9 to 19 more acres of trees being cut. And so if you want to talk about permanent impacts, those trees being cut, Tennessee may not consider them to be permanent because those trees will be allowed to regrow, but it's going to take 30 to 50 years for those trees to regrow. So I don't see the difference between the trees being cut for the compression alternative and the trees being cut for the looping project as being any different. In fact, it's more for the looping project. The owner-keeper's preference would be to use the compression alternative. I think not only is it our – were you asking if it was our preference? I don't think it's just our preference. I think it's demanded by the law. And the Utahans' case makes it very clear that they are compelled to choose the less environmentally practically practicable alternative. I tried to make myself familiar with what this thing would look like, and I have failed, quite frankly. But it sounds like something quite ugly. I understand that it has its own emissions. It's not fuel-efficient, but it has its own potential for green grass emissions. So it has its own environmental detraction. So maybe you can help me understand why is that – from your perspective, why is that better? Well, one, there are zero impacts to wetlands and waterways. Is it because it doesn't intrude into the wetlands? Yeah, one, there's zero impacts to wetlands and waterways. So that's number one. I mean, it's ironic that the Corps is arguing that there's a significant adverse environmental consequence for a project that wouldn't even require them to issue a permit. But number two, when you're talking about a compressor station, I mean, it depends on what TGP wants to do. I've seen compressor stations that look like barns because, you know, the company decided that they wanted to try to fit it in with the local character. There are ways that that can happen. So that is – and, again, that's obviously not in the analysis. But just to answer your question, that's a possibility. But, again, going back to the air, light, and noise impacts, those are not impacts that relate to water resources, and they're not quantified. We don't know if they're big. We don't know if they're small. We don't know anything. But we also know that FERC routinely finds that compressor stations, whether it's Minisink, whether it's Hancock, there's a litany of administrative decisions out of the Federal Energy Regulatory Commission, finding that compressor stations don't result in significant environmental consequences. All right. Thank you. Judge Nygaard, anything further? Thank you.  Thank you, Mr. Stemplitz. Thank you, Your Honor. Let me thank all of counsel for your excellent briefing and for your very helpful argument here this morning. I think we'll see a few of you in a few minutes. But as to this matter, we'll take it under advisement.